# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

UNITED STATES OF AMERICA

v.                                                          Case Number: 4:16cr29-RH

ERVIN BELL III
 a/k/a "Norris Bell"
 a/k/a "President"
_____/

## STATEMENT OF FACTS

The defendant admits that if this case were to proceed to trial, the government could prove the following beyond a reasonable doubt.

In June 2014, a Reliable Confidential Informant ("RCI") began to provide law enforcement information regarding a local drug trafficking organization headed by Ervin Bell, III. The RCI identified Bell as the primary source of powder and crack cocaine in the South City neighborhood of Tallahassee. The RCI also identified Steven Kashun Koonce, a/k/a Steven Kashun Woods, as one of Bell's closest and most trusted criminal associates. Koonce, a former federal defendant, was most recently released from the Florida Department of Corrections ("FDOC") on March 17, 2014, after serving a ten-year sentence for cocaine trafficking. Within days of Koonce's release from the FDOC, Bell hosted a large party to demonstrate his appreciation for Koonce not cooperating with law enforcement.

FILED IN OPEN COURT ON
September 7, 2016
United States District Court
Northern District of Florida

The RCI was considered a trusted, long-time friend of both Bell and Koonce. As such, the RCI was able to conduct numerous controlled purchases of both powder and crack cocaine from Bell and Koonce. The RCI advised that Bell was supplying Koonce and numerous other drug traffickers with powder and crack cocaine, which Bell cooked and distributed from a residence he maintained on Golf Terrace Drive.

In July 2014, the RCI began to conduct controlled purchases of both powder and crack cocaine from Bell and Koonce under the direction and supervision of law enforcement. The audio / video recorded controlled purchases are detailed below.

On July 8, 2014, the RCI placed a controlled call to Koonce to negotiate the purchase of a $50 "boy" (crack), and two "girls" (powder) for $20 each. They agreed on the meeting location and time. Shortly thereafter, the RCI met with Koonce, and entered his red convertible mustang where the cocaine transaction took place. Koonce stated that he came from the "back street" (referring to Golf Terrace Drive). While inside of the mustang, the RCI observed that Koonce had 20-30 small baggies of powder cocaine packaged for sale. Koonce provided the RCI approximately 1 gram of crack and 1.5 grams of powder cocaine in exchange for $90. **(Count Two)**

On July 15, 2014, the RCI placed a controlled call to Koonce to negotiate the purchase of five "dubs" (packages of powder cocaine), indicating that he/she had $100. Koonce advised he could be there in five minutes if the RCI had the "money in your hand." Koonce met the RCI at the Petro Gas Station on West Orange Avenue.

The RCI entered the red mustang and Koonce provided five $20 baggies of cocaine in exchange for $100. Koonce discussed "fronting" cocaine to the RCI. Koonce advised that he would "front" the RCI 1/8 of an ounce after Koonce had paid his car note and insurance. **(Count Three)**

On July 25, 2014, the RCI placed a controlled call to Koonce to negotiate the purchase of seven "dubs" (packages of powder cocaine), indicating that he/she had $140. Koonce again agreed to met the RCI at the Petro Gas Station on West Orange Avenue. Upon arrival, the RCI entered the red mustang and Koonce provided seven $20 baggies of cocaine in exchange for $140. The RCI and Koonce discussed the RCI selling drugs for Koonce. Koonce advised that he had product to flip and then he would "fronting" 1/8 of an ounce quantities to the RCI. **(Count Four)**

On October 24, 2014, the RCI placed a controlled call to Koonce to negotiate the purchase of six "dubs" (packages of powder cocaine), indicating that he/she had $120. Koonce again agreed to met the RCI at the Petro Gas Station on West Orange Avenue. Upon arrival, the RCI entered a green Dodge pickup driven by Koonce. Koonce provided the RCI six $20 baggies of cocaine in exchange for $120. Koonce discussed "fronting" the RCI a larger amount of cocaine along with a cutting agent, such that the RCI could sell cocaine for Koonce. Following the cocaine transaction, Koonce discussed his recent traffic accident in the red mustang in which he had to

pay off the other driver not to identify him, and discarded an ounce of cocaine while fleeing on foot from law enforcement. **(Count Five)**

On December 5, 2014, law enforcement utilized a confidential source ("CS") to attempt a controlled purchase of cocaine from Bell. The CS approached the porch of the Golf Terrace Drive residence and was invited inside by Bell. The CS observed cocaine and cannabis in plain view. The CS then ordered ½ an ounce of cocaine. Bell made a telephone call and advised the other party receiving the call to "get two Vicks ready" (two seven gram packages of cocaine). Bell then departed in the same green Dodge truck used by Koonce in the October 24th controlled purchase.

While waiting on the front porch of the Golf Terrace Drive residence with Stacy Thyrone Young, a/k/a "Bama," the CS observed a young black male on a bicycle arrive and advise Young that law enforcement officers had been spotted in a pickup truck nearby. Bell was contacted by telephone. Bell instructed Young to "clean the house." Bell arrived shortly thereafter will no cocaine for the CS. Bell returned the money to the CS and advised that he would provide the CS with cocaine at a later time, stating that he had to "clean the house."

On January 23, 2015, another RCI placed a controlled call to Bell to negotiate the purchase of $100 worth of powder cocaine. The RCI advised Bell that he/she "needed to do some business with you. I need 100 copies." Bell then asked who was coming with the RCI. The RCI responded that he/she was coming alone. Bell stated

that he would talk with the RCI when he/she arrived. Bell was present at the Golf Terrace Drive residence at the time of the call and when the RCI arrived. The RCI was invited inside by Bell, and supplied 2.2 grams of cocaine for $100. **(Count Six)** While conducting this transaction, the RCI observed approximately one kilogram of cocaine, one pound of marijuana, and a large amount of currency.

After safely exiting the Golf Terrace Drive residence, the RCI provided additional details to law enforcement regarding his/her observations while inside the residence. The RCI stated that upon entering the residence with Bell he/she observed a black female counting a large amount of currency at the kitchen table. The RCI observed one shoe box full of currency and several stacks of bills lying on the table. The RCI described a large plastic bag containing cannabis. Bell asked the RCI how he/she obtained his telephone number. The RCI stated that he/she obtained Bell's number while buying from Koonce. After presenting Bell with the $100, Bell went into an adjacent bedroom and returned with a brown leather briefcase. Bell removed a large plastic ziplock bag from the briefcase. The RCI estimated that the amount of cocaine in the ziplock bag was equal to that of one pound of sugar, and that is was a solid rock, rather than in a powder form. Bell then scrapped a piece of cocaine from the brick form and weighed it on a scale. The digital display indicated 2.2 grams.

On July 29, 2015, law enforcement enlisted the assistance of another CS to conduct a controlled purchase of cocaine from Bell. The CS approached the front porch of the Golf Terrace Drive residence and made contact with Stacy Thyrone Young, whom the CS knew as "Bama." The CS asked where Bell was and Young stated that Bell was inside "cooking." The CS then requested $100 worth of cocaine and Young took the money and walked inside the residence. Young then returned with approximately 1 gram of cocaine. **(Count Seven)**

On August 4, 2015, law enforcement enlisted the assistance of a CS to conduct a controlled purchase of cocaine from Bell. The CS approached the front porch of the Golf Terrace Drive residence and made contact with Young and Bell. The CS asked for "powder" and Bell walked inside asking Young to accompany him. Shortly thereafter Young exited the residence and took his seat on the porch. Bell then exited and exchanged approximately one gram of powder cocaine for $100 with the CS. **(Count Eight)**

On August 13, 2015, law enforcement enlisted the assistance of a Cooperating Defendant ("CD") to conduct a controlled purchase of crack cocaine from Bell. The CD drove to the Golf Terrace Drive residence and made contact with Bell in the kitchen area. The CD exchanged $350 for a "circle" of crack cocaine, which later weighed approximately 7.9 grams. Bell and the CD then discuss future cocaine transactions. **(Count Nine)**

On August 21, 2015, the CD placed a recorded call to Bell to negotiate the purchase of "a girl" (one ounce of powder cocaine). During the controlled call Bell advised the CD that the "girl will be $1,300."

On August 25, 2015, the CD drove to the Golf Terrace Drive residence and made contact with Bell in the kitchen area. While the CD is waiting, a bag of suspected cocaine can be seen lying on the kitchen counter. Bell then states that he has "a whole one and 21, so you can get a whole one for 13. I ain't gonna be able to serve you no circles because I ain't gonna be able to get more until tomorrow." The CD provided Bell with $1,300 and receives approximately 25 grams of cocaine.

**(Count Ten)**

On September 9, 2015, the CD placed a recorded call to Bell to negotiate the purchase of two ounces of powder cocaine. During the controlled call the CD asked Bell if the CD could get "two onions" on Friday. Bell responded, "Well if you needed now… I sure got em now!" Bell continued by stating, "When I get back to the house I'm gone call you and we can rap. Cause I wanna pull your coattail on little word, been floating around that the spot being watched and all this shit!" The CD acknowledged Bell's concern and agreed to conduct the cocaine purchase later.

On September 11, 2015, the CD drove to the Golf Terrace Drive residence and made contact with Bell who was sitting on the front porch with Young. The CD entered the residence with Bell who advised that he forgot to "order" the cocaine

7

requested by the CD. Bell then placed a telephone call and advised the other party to the call to "add another one." Bell then advises the CD that he will need to pick up the additional cocaine and that he will be right back. Before Bell can depart the residence additional customers are approaching the porch requesting cocaine. Bell then directs Young to sell certain customers gram amounts of cocaine in his absence. Bell then departed in an silver Nissan sedan to obtain the cocaine. Within a few minutes Bell returned and supplied the CD with 56 grams of cocaine in exchange for $2,600. **(Count Eleven)**

Following the three controlled purchases from Bell, the CD provided law enforcement with additional details regarding his/her personal knowledge of Bell's drug trafficking organization. The CD explained that Bell kept his cocaine and cooking utensils at the Golf Terrace Drive "trap house" and normally kept his drug proceeds at Bell's primary residence on Harwood Drive, which was known as the "White House." The CD explained that Bell's nickname is "President" and therefore, his home is known as the "White House." The CD advised that Bell's money was kept in three different safes located in the Harwood Drive residence. The CD further stated that Bell deposits his drug proceeds into his business account for his lawn mowing business, All in One Lawn Care. The CD stated that the business is actually a front to launder the money Bell obtains from the sale of cocaine.

The CD also detailed his/her prior drug transactions for Bell. The CD advised that he/she sold cocaine that belonged to Bell from the Golf Terrace Drive residence and was allowed to keep the profits over and above the "purchase" costs. The CD explained that he/she paid Bell $475 for a "circle" of crack cocaine, which allowed him/her to make some profit depending on the volume of crack sold on a given day. Bell also stretched the cocaine he bought be "re-rocking" and adding cutting agents. Bell routinely stretched 18oz of cocaine into 30oz in this manner. The CD advised that Bell sold 7 grams of cocaine for approximately $350, and instructed his sellers how to cut the cocaine in order to make $60-$100 per circle, or $200 per 2.5-3grams.

The CD advised that Young also sold powder and crack cocaine from the Golf Terrace Drive residence for Bell. The CD advised that Young was a prolific crack cocaine user, and that Bell provided Young with crack to use, and a place to stay in exchange for Young's daily assistance selling crack from the Golf Terrace Drive residence. The CD stated that Young typically sold four "circles" of crack each day. Based on the "circle" purchased from Bell during the August 13th controlled purchase, one "circle" would equate to roughly 7 grams. As such, four "circles" would equated to approximately 28 grams a day, seven days a week for well over a year. An incredibly conservative estimate of one "circle" a day for one year would equated to 2,555 grams of crack cocaine distributed by Young on behalf of Bell.

The CD explained that Bell enforced strict rules for those who sold for him. If his sellers displeased him or cheated him, they were "fined" or "suspended" by Bell, resulting in a limitation on what types of drugs they could sell for him and where they could sell it. The CD referenced a term used by Bell – the box. This was term Bell used to describe the yard in front of his Golf Terrance Drive residence. Bell absolutely forbid anyone to sell cocaine that was not supplied by him in the box. However, Bell would also reward those who sold for him. The CD explained that Bell paid for Young to take a short three-day cruise out of Carrabelle for his consistent crack sales. Bell also gave out free drugs to some as a reward for sales.

The CD also provided information regarding at least one of Bell's cocaine suppliers. The CD detailed his/her personal observations of the supplier as well as the amounts of cocaine Bell was purchasing. The CD stated that the most cocaine he/she ever observed Bell receive at one time was two "birds" (kilograms). The CD stated that Bell normally received one to two kilograms from the cocaine source every Friday. The CD explained that Bell was paying the source approximately $1,100 an ounce, equating to $30,800 per kilogram.

The CD also discussed Bell's assets which were derived from his drug proceeds. Despite owning the All in One Lawn Care business, Bell did not conduct much legitimate business. The CD explained that the lawn business was simply a "front," and Bell bought a 2010 Dodge Challenger, a 1994 Dodge Pickup Truck, and

a 2003 Honda Shadow Motorcycle with his drug proceeds. In addition, Bell purchased computers and paid for trips for his children. Through the course of investigation, law enforcement officers corroborated the CD's statements, in that Bell was observed using numerous vehicles to transport cocaine, specifically his 2010 Dodge Challenger, his 1994 Dodge Ram pickup.

On April 26, 2016, law enforcement enlisted the assistance of a CS to conduct a controlled purchase of cocaine from Young. The CS approached the front porch of the Golf Terrace Drive residence and made contact with Young. The CS asked for "powder" and Young provided the CS with less than a gram of cocaine for $30. **(Count Twelve)**

On May 20, 2016, law enforcement officers executed a search warrant at the Golf Terrace Drive residence maintained by Bell. Upon execution, officers located a "trap" which consisted of a hole cut into the floor of the living room of the residence. The "trap" was concealed by a large piece of furniture. Within the "trap" officers located a large, metal cocaine press and approximately four ounces of suspected cocaine. Subsequent forensic testing identified the seized substance as cocaine hydrochloride with a net weight of 116.9 grams.

# ELEMENTS

Conspiracy to Distribute & Possession With Intent to Distribute Cocaine and Cocaine Base – 21 U.S.C. Section 846

(1) two or more people in some way agreed to try to accomplish a shared and unlawful plan to possess with intent to distribute or distribute cocaine and cocaine base;
(2) the Defendant, knew the unlawful purpose of the plan and willfully joined in it.

Distribution of Cocaine and Cocaine Base – 21 U.S.C. 841(a)(1)

(1) the Defendant knowingly distributed cocaine and cocaine base.

CHRISTOPHER P. CANOVA
United States Attorney

_____
Nathan Prince
Attorney for Defendant

9/7/16
Date

_____
Ervin Bell, III
Defendant

_____
Jason R. Coody
Assistant United States Attorney
Kansas Bar No. 20805
Northern District of Florida
111 N. Adams Street, Fourth Floor
Tallahassee, FL 32301
(850) 942-8430
Jason.Coody@usdoj.gov