**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**UNITED STATES OF AMERICA**

**v.**                                         **Case No. 4:16cr29-RH/MAF-1**
                                                    **4:22cv19-RH-MAF**

**ERVIN BELL III**

_____/

## GOVERNMENT'S RESPONSE TO DEFENDANT BELL'S MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE

Defendant Ervin Bell III, also known as "President," moves for relief from his sentence. He contends that his lawyer failed to raise two objections to sentencing guidelines increases related to Defendant's maintenance of a premises for drug trafficking and his management of a criminal activity. Because the record conclusively shows that defense counsel acted reasonably in declining to raise unmeritorious objections to these calculations, and Defendant has not alleged reasonably specific facts showing otherwise, this Court should deny the motion without further proceedings.

## LEGAL STANDARD

Under §2255(a), a federal prisoner may ask the sentencing district court for relief from his sentence by claiming, among other things, that it "was imposed in

violation of the Constitution or laws of the United States." A defendant has the burden to show that he is entitled to relief. See *Rivers v. United States*, 777 F.3d 1306, 1316 (11th Cir. 2015).

If a defendant alleges reasonably specific facts that, if true, would entitle him to relief, then the district court should order an evidentiary hearing and rule on the merits of his claim. See *Holmes v. United States*, 876 F.2d 1545, 1552 (11th Cir. 1989). But an evidentiary hearing is not required where the claims lack merit as a matter of law or the defendant offers "merely conclusory allegations unsupported by specifics or contentions that in the face of the record are wholly incredible." See *Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991).

The Sixth Amendment guarantees the right to effective assistance of counsel. To show constitutional ineffectiveness a defendant must prove that his lawyer's performance was deficient and prejudicial. *Strickland v. Washington*, 466 U.S. 668, 691 (1984). For deficiency, a defendant must show that "counsel's representation fell below an objective standard of reasonableness," *id.* at 688, by "overcom[ing] a strong presumption of competence, and the court must give significant deference to the attorney's decisions." See *Hagins v. United States*, 267 F.3d 1202, 1204–1205 (11th Cir. 2001). For prejudice, a defendant must show that there "is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 455 U.S. at 694).

## BACKGROUND

In May 2016 a federal grand jury charged Defendant with multiple drug crimes. Count 1 charged conspiracy to possess with intent to distribute 500 or more grams of cocaine and 28 grams or more of crack cocaine in violation of 21 U.S.C. §§841(a)(1) and (b)(1)(b) and 846. Counts 6, 8, 10, and 11 each charged distribution of cocaine and crack cocaine in violation of 21 U.S.C. §841(a)(1) (b)(1)(C). Count 9 charged distribution of crack in violation of 21 U.S.C. §841(a)(1) and (b)(1)(C). ECF 1. On June 12, 2016, the Court granted Defendant's motion to substitute retained counsel, Nathan Prince. ECF 20, 22.

On September 7, 2016, Defendant pleaded guilty to Counts 1, 6, and 8 through 11. ECF 50. As part of his guilty plea, Defendant signed a statement agreeing that the Government could prove the following facts beyond a reasonable doubt:

> In June 2014, a Reliable Confidential Informant ("RCI") began to provide law enforcement information regarding a local drug trafficking organization headed by Ervin Bell, III. The RCI identified Bell as the primary source of powder and crack cocaine in the South City neighborhood of Tallahassee. The RCI also identified Steven Kashun Koonce, a/k/a Steven Kashun Woods, as one of Bell's closest and most trusted criminal associates. Koonce, a former federal defendant, was most recently released from the Florida Department of Corrections ("FDOC") on March 17, 2014, after serving a ten-year sentence for cocaine trafficking. Within days of Koonce's release from the FDOC, Bell hosted a large party to demonstrate his appreciation for Koonce not cooperating with law enforcement.

The RCI was considered a trusted, long-time friend of both Bell and Koonce. As such, the RCI was able to conduct numerous controlled purchases of both powder and crack cocaine from Bell and Koonce. The RCI advised that Bell was supplying Koonce and numerous other drug traffickers with powder and crack cocaine, which Bell cooked and distributed from a residence he maintained on Golf Terrace Drive.

In July 2014, the RCI began to conduct controlled purchases of both powder and crack cocaine from Bell and Koonce under the direction and supervision of law enforcement. The audio / video recorded controlled purchases are detailed below.

On July 8, 2014, the RCI placed a controlled call to Koonce to negotiate the purchase of a $50 "boy" (crack), and two "girls" (powder) for $20 each. They agreed on the meeting location and time. Shortly thereafter, the RCI met with Koonce, and entered his red convertible mustang where the cocaine transaction took place. Koonce stated that he came from the "back street" (referring to Golf Terrace Drive). While inside of the mustang, the RCI observed that Koonce had 20-30 small baggies of powder cocaine packaged for sale. Koonce provided the RCI approximately 1 gram of crack and 1.5 grams of powder cocaine in exchange for $90. **(Count Two)**

On July 15, 2014, the RCI placed a controlled call to Koonce to negotiate the purchase of five "dubs" (packages of powder cocaine), indicating that he/she had $100. Koonce advised he could be there in five minutes if the RCI had the "money in your hand." Koonce met the RCI at the Petro Gas Station on West Orange Avenue. The RCI entered the red mustang and Koonce provided five $20 baggies of cocaine in exchange for $100. Koonce discussed "fronting" cocaine to the RCI. Koonce advised that he would "front" the RCI 1/8 of an ounce after Koonce had paid his car note and insurance. **(Count Three)**

On July 25, 2014, the RCI placed a controlled call to Koonce to negotiate the purchase of seven "dubs" (packages of powder cocaine), indicating that he/she had $140. Koonce again agreed to met the RCI at the Petro Gas Station on West Orange Avenue. Upon arrival, the RCI entered the red mustang and Koonce provided seven $20 baggies of cocaine in exchange for $140. The RCI and Koonce discussed the RCI

selling drugs for Koonce.  Koonce advised that he had product to flip and then he would [be] "fronting" 1/8 of an ounce quantities to the RCI. **(Count Four)**

On October 24, 2014, the RCI placed a controlled call to Koonce to negotiate the purchase of six "dubs" (packages of powder cocaine), indicating that he/she had $120. Koonce again agreed to met the RCI at the Petro Gas Station on West Orange Avenue. Upon arrival, the RCI entered a green Dodge pickup driven by Koonce. Koonce provided the RCI six $20 baggies of cocaine in exchange for $120. Koonce discussed "fronting" the RCI a larger amount of cocaine along with a cutting agent, such that the RCI could sell cocaine for Koonce.  Following the cocaine transaction, Koonce discussed his recent traffic accident in the red mustang in which he had to pay off the other driver not to identify him, and discarded an ounce of cocaine while fleeing on foot from law enforcement. **(Count Five)**

On December 5, 2014, law enforcement utilized a confidential source ("CS") to attempt a controlled purchase of cocaine from Bell. The CS approached the porch of the Golf Terrace Drive residence and was invited inside by Bell.  The CS observed cocaine and cannabis in plain view.  The CS then ordered ½ an ounce of cocaine. Bell made a telephone call and advised the other party receiving the call to "get two Vicks ready" (two seven gram packages of cocaine). Bell then departed in the same green Dodge truck used by Koonce in the October 24th controlled purchase.

While waiting on the front porch of the Golf Terrace Drive residence with Stacy Thyrone Young, a/k/a "Bama," the CS observed a young black male on a bicycle arrive and advise Young that law enforcement officers had been spotted in a pickup truck nearby. Bell was contacted by telephone. Bell instructed Young to "clean the house." Bell arrived shortly thereafter wi[th] no cocaine for the CS. Bell returned the money to the CS and advised that he would provide the CS with cocaine at a later time, stating that he had to "clean the house."

On January 23, 2015, another RCI placed a controlled call to Bell to negotiate the purchase of $100 worth of powder cocaine. The RCI advised Bell that he/she "needed to do some business with you. I need 100 copies." Bell then asked who was coming with the RCI. The RCI

responded that he/she was coming alone. Bell stated that he would talk with the RCI when he/she arrived. Bell was present at the Golf Terrace Drive residence at the time of the call and when the RCI arrived. The RCI was invited inside by Bell, and supplied 2.2 grams of cocaine for $100. **(Count Six)** While conducting this transaction, the RCI observed approximately one kilogram of cocaine, one pound of marijuana, and a large amount of currency.

After safely exiting the Golf Terrace Drive residence, the RCI provided additional details to law enforcement regarding his/her observations while inside the residence. The RCI stated that upon entering the residence with Bell he/she observed a black female counting a large amount of currency at the kitchen table. The RCI observed one shoe box full of currency and several stacks of bills lying on the table. The RCI described a large plastic bag containing cannabis. Bell asked the RCI how he/she obtained his telephone number. The RCI stated that he/she obtained Bell's number while buying from Koonce. After presenting Bell with the $100, Bell went into an adjacent bedroom and returned with a brown leather briefcase. Bell removed a large plastic ziplock bag from the briefcase. The RCI estimated that the amount of cocaine in the ziplock bag was equal to that of one pound of sugar, and that is was a solid rock, rather than in a powder form. Bell then scrapped a piece of cocaine from the brick form and weighed it on a scale. The digital display indicated 2.2 grams.

On July 29, 2015, law enforcement enlisted the assistance of another CS to conduct a controlled purchase of cocaine from Bell. The CS approached the front porch of the Golf Terrace Drive residence and made contact with Stacy Thyrone Young, whom the CS knew as "Bama." The CS asked where Bell was and Young stated that Bell was inside "cooking." The CS then requested $100 worth of cocaine and Young took the money and walked inside the residence. Young then returned with approximately 1 gram of cocaine. **(Count Seven)**

On August 4, 2015, law enforcement enlisted the assistance of a CS to conduct a controlled purchase of cocaine from Bell. The CS approached the front porch of the Golf Terrace Drive residence and made contact with Young and Bell. The CS asked for "powder" and Bell walked inside asking Young to accompany him. Shortly thereafter Young exited the residence and took his seat on the porch. Bell then

exited and exchanged approximately one gram of powder cocaine for $100 with the CS. **(Count Eight)**

On August 13, 2015, law enforcement enlisted the assistance of a Cooperating Defendant ("CD") to conduct a controlled purchase of crack cocaine from Bell. The CD drove to the Golf Terrace Drive residence and made contact with Bell in the kitchen area. The CD exchanged $350 for a "circle" of crack cocaine, which later weighed approximately 7.9 grams. Bell and the CD then discuss future cocaine transactions. **(Count Nine)**

On August 21, 2015, the CD placed a recorded call to Bell to negotiate the purchase of "a girl" (one ounce of powder cocaine). During the controlled call Bell advised the CD that the "girl will be $1,300."

On August 25, 2015, the CD drove to the Golf Terrace Drive residence and made contact with Bell in the kitchen area. While the CD is waiting, a bag of suspected cocaine can be seen lying on the kitchen counter. Bell then states that he has "a whole one and 21, so you can get a whole one for 13. I ain't gonna be able to serve you no circles because I ain't gonna be able to get more until tomorrow." The CD provided Bell with $1,300 and receives approximately 25 grams of cocaine. **(Count Ten)**

On September 9, 2015, the CD placed a recorded call to Bell to negotiate the purchase of two ounces of powder cocaine. During the controlled call the CD asked Bell if the CD could get "two onions" on Friday. Bell responded, "Well if you needed now... I sure got em now!" Bell continued by stating, "When I get back to the house I'm gone call you and we can rap. Cause I wanna pull your coattail on little word, been floating around that the spot being watched and all this shit!" The CD acknowledged Bell's concern and agreed to conduct the cocaine purchase later.

On September 11, 2015, the CD drove to the Golf Terrace Drive residence and made contact with Bell who was sitting on the front porch with Young. The CD entered the residence with Bell who advised that he forgot to "order" the cocaine requested by the CD. Bell then placed a telephone call and advised the other party to the call to "add another

one." Bell then advises the CD that he will need to pick up the additional cocaine and that he will be right back. Before Bell can depart the residence additional customers are approaching the porch requesting cocaine. Bell then directs Young to sell certain customers gram amounts of cocaine in his absence. Bell then departed in a[] silver Nissan sedan to obtain the cocaine. Within a few minutes Bell returned and supplied the CD with 56 grams of cocaine in exchange for $2,600. **(Count Eleven)**

Following the three controlled purchases from Bell, the CD provided law enforcement with additional details regarding his/her personal knowledge of Bell's drug trafficking organization. The CD explained that Bell kept his cocaine and cooking utensils at the Golf Terrace Drive "trap house" and normally kept his drug proceeds at Bell's primary residence on Harwood Drive, which was known as the "White House." The CD explained that Bell's nickname is "President" and therefore, his home is known as the "White House." The CD advised that Bell's money was kept in three different safes located in the Harwood Drive residence. The CD further stated that Bell deposits his drug proceeds into his business account for his lawn mowing business, All in One Lawn Care. The CD stated that the business is actually a front to launder the money Bell obtains from the sale of cocaine.

The CD also detailed his/her prior drug transactions for Bell. The CD advised that he/she sold cocaine that belonged to Bell from the Golf Terrace Drive residence and was allowed to keep the profits over and above the "purchase" costs. The CD explained that he/she paid Bell $475 for a "circle" of crack cocaine, which allowed him/her to make some profit depending on the volume of crack sold on a given day. Bell also stretched the cocaine he bought be "re-rocking" and adding cutting agents. Bell routinely stretched 18oz of cocaine into 30oz in this manner. The CD advised that Bell sold 7 grams of cocaine for approximately $350, and instructed his sellers how to cut the cocaine in order to make $60-$100 per circle, or $200 per 2.5-3grams.

The CD advised that Young also sold powder and crack cocaine from the Golf Terrace Drive residence for Bell. The CD advised that Young was a prolific crack cocaine user, and that Bell provided Young with crack to use, and a place to stay in exchange for Young's daily assistance selling crack from the Golf Terrace Drive residence. The CD

stated that Young typically sold four "circles" of crack each day. Based on the "circle" purchased from Bell during the August 13th controlled purchase, one "circle" would equate to roughly 7 grams. As such, four "circles" would equated to approximately 28 grams a day, seven days a week for well over a year. An incredibly conservative estimate of one "circle" a day for one year would equated to 2,555 grams of crack cocaine distributed by Young on behalf of Bell.

The CD explained that Bell enforced strict rules for those who sold for him. If his sellers displeased him or cheated him, they were "fined" or "suspended" by Bell, resulting in a limitation on what types of drugs they could sell for him and where they could sell it. The CD referenced a term used by Bell – the box. This was term Bell used to describe the yard in front of his Golf Terrace Drive residence. Bell absolutely forbid anyone to sell cocaine that was not supplied by him in the box. However, Bell would also reward those who sold for him. The CD explained that Bell paid for Young to take a short three-day cruise out of Carrabelle for his consistent crack sales. Bell also gave out free drugs to some as a reward for sales.

The CD also provided information regarding at least one of Bell's cocaine suppliers. The CD detailed his/her personal observations of the supplier as well as the amounts of cocaine Bell was purchasing. The CD stated that the most cocaine he/she ever observed Bell receive at one time was two "birds" (kilograms). The CD stated that Bell normally received one to two kilograms from the cocaine source every Friday. The CD explained that Bell was paying the source approximately $1,100 an ounce, equating to $30,800 per kilogram.

The CD also discussed Bell's assets which were derived from his drug proceeds. Despite owning the All in One Lawn Care business, Bell did not conduct much legitimate business. The CD explained that the lawn business was simply a "front," and Bell bought a 2010 Dodge Challenger, a 1994 Dodge Pickup Truck, and a 2003 Honda Shadow Motorcycle with his drug proceeds. In addition, Bell purchased computers and paid for trips for his children. Through the course of investigation, law enforcement officers corroborated the CD's statements, in that Bell was observed using numerous vehicles to transport cocaine, specifically his 2010 Dodge Challenger, [and] his 1994 Dodge Ram pickup.

On April 26, 2016, law enforcement enlisted the assistance of a CS to conduct a controlled purchase of cocaine from Young. The CS approached the front porch of the Golf Terrace Drive residence and made contact with Young. The CS asked for "powder" and Young provided the CS with less than a gram of cocaine for $30. **(Count Twelve)**

On May 20, 2016, law enforcement officers executed a search warrant at the Golf Terrace Drive residence maintained by Bell. Upon execution, officers located a "trap" which consisted of a hole cut into the floor of the living room of the residence. The "trap" was concealed by a large piece of furniture. Within the "trap" officers located a large, metal cocaine press and approximately four ounces of suspected cocaine. Subsequent forensic testing identified the seized substance as cocaine hydrochloride with a net weight of 116.9 grams.

ECF 51. The Court accepted Defendant's guilty plea.

The presentence report (PSR) made the following guidelines calculations. The base offense level was set at 34 because the PSR determined that the offense involved between 10,000 and 30,000 kilograms of marijuana equivalent. ECF 84 ¶60 (citing U.S.S.G. §2D1.1(a)(5) & (c)(3)). The PSR then applied a 2-level increase for the specific offense characteristic of maintaining a premises for the purpose of manufacturing or distributing a controlled substance based on Defendant maintaining the residence at Golf Terrace Drive "for the almost sole reason of drug distribution." ECF 84 ¶61 (citing U.S.S.G. §2D1.1(b)(12)). The PSR then made a 3-level upward adjustment for Defendant being a manager or supervisor in criminal activity involving 5 or participants or that was otherwise extensive. ECF 84 ¶63 (citing U.S.S.G. §3B1.1(b)). Defendant received a 3-level decrease for acceptance of responsibility.

ECF 84 ¶¶67, 68. When the total offense level of 36 was combined with Defendant's criminal history category III, the guideline range of imprisonment was 235 to 293 months. ECF 84 ¶136. Under §§841(b)(1) and 851, Count 1 carried a minimum mandatory term of 10 years and a maximum of life. Through counsel, Defendant objected to the drug quantity that the PSR attributed to Defendant. ECF 84 ¶158.

Sentencing was on June 27, 2017. ECF 115. The government presented testimony from a law enforcement officer on the drug-quantity issue, but it touched on the issues here. ECF 153-8. The officer testified that a source had indicated that Defendant had called and ordered his house to "cleaned" because law enforcement was in the area. ECF 153-8 at 4. Other cooperating defendants told law enforcement that Defendant served up cocaine and crack at the residence on Golf Terrace, which was consistent with other information. ECF 153-8 at 6. One cooperator told law enforcement that he was selling drugs for Defendant at Golf Terrace on a daily basis for well over two years. ECF 153-8 at 6-7. The cooperator identified multiple persons by name who obtained drugs from Defendant at the residence, the "bigger ones," and there were others. ECF 153-8 at 8-9. One of Defendants' distributors lived with Defendant at Golf Terrace. ECF 153-8 at 12. Other witnesses told law enforcement that they had observed cash and drugs at that residence. ECF 153-8 at 27. Law enforcement observed the level of drug trafficking going to and from Golf Terrace. ECF 153-8 at 35.

After hearing evidence, the Court revised PSR paragraph 60 to reflect a base offense level of 32 based on a finding that Defendant was responsible for at least 840 grams of crack and not enough crack or powder to reach level 34. ECF 130 at 50–51; ECF 117 at 1. The revised guideline calculation, with a total offense level of 34, was 188 to 235 months of imprisonment. ECF 117 at 1.

The Court then imposed a sentence of 188 months of imprisonment, the bottom of the guidelines, on all counts to run concurrent, supervised release for 8 years on Count 1, and 5 years on the remaining counts. ECF 116. The Court explained that the guidelines accounted for mitigating factors but Defendant's "very extensive criminal history" was "not fully measured by the guidelines." ECF 153-8 at 82. The Court explained its best judgment was that a sentence of 188 months was sufficient but not greater than necessary. ECF 153-8 at 82. No notice of appeal was filed at that time.

On March 28, 2018, Defendant filed a motion for relief from his sentence raising several claims of ineffective assistance of counsel. ECF 121. Defendant contended that his lawyer failed to raise two objections to the sentencing guidelines calculation, failed to challenge the quantity of drugs attributed to him at sentencing, failed to object to a sentencing enhancement under 21 U.S.C. §851, and failed to follow instructions to file an appeal of his sentence.

To respond to the motion, the Government obtained a sworn statement from Mr. Prince. See ECF 132-2. The government responded that Defendant was clearly not entitled to relief except on the appeal claim. This was so because defense counsel *did* challenge the drug quantity and the other claims were without merit. ECF 132.

After an evidentiary hearing, the government conceded that Defendant was entitled to relief on the appellate claim. The Court agreed and vacated Defendant's sentence and reimposed it. The Court denied other claims without prejudice. ECF 158 (report and recommendation), 159 (order), and 160 (amended judgment).

Defendant then appealed his sentence. He asserted that this Court clearly erred in relying on a hearsay co-conspirator statement and that the Court's conclusion that he was responsible for at least 840 grams of cocaine base was speculative. ECF 170 at 2.

On October 5, 2020, the Eleventh Circuit affirmed Defendant's sentence, explaining that "the calculation and attribution of drug quantities in cases where not all of the drugs trafficked are seized is necessarily a difficult task" which this Court "undertook . . . with great care, thoroughly reviewing all of the evidence before it settled on a conservative estimate of the drug quantity for which [Defendant] could fairly be held responsible." ECF 170 at 9.

On January 3, 2022, just before the statute of limitations ran, Defendant filed another motion to vacate his sentence. ECF 172. He contends that defense counsel

was constitutionally ineffective by not challenging the guideline increases under U.S.S.G. §§2D1.1(b)(12) and 3B1.1(b).

## ARGUMENT

Defendant contends that defense counsel was ineffective by failing to file proper objections to the PSR, specifically the guidelines enhancements for maintaining a premises for drug-distribution purposes and his managerial role in the offenses. ECF 172 at 3. Defendant says that the "evidence reflected that [Defendant] did not maintain the Golf Terrace residence for the primary purpose of manufacturing or distributing a controlled substance" but that Defendant "lived in that home and operated his lawn care business from that location." ECF 172 at 3. Defendant says that the government "would have also been unable to establish by a preponderance of the evidence that [Defendant] was a manager or supervisor of criminal activity that involved five or more participants." ECF 172 at 3. Both of those contentions are plainly wrong. Defendant has not shown ineffective assistance of counsel. This Court should deny the motion.

According to defense counsel, Defendant raised these issues during the representation. ECF 132-2 at 3. Defense counsel researched both issues and explained to Defendant in detail that the facts he had admitted as part of his plea established the validity of each of these enhancements. ECF 132-2 at 3. Defense counsel made the judgment not to file objections to those enhancements because neither the law nor

the facts admitted by Defendant as part of his plea warranted objection. ECF 132-2 at 3. Defense counsel's decision was objectively reasonable on both points. Defendant's present motion alleges no reasonably specific facts to undermine that professional judgment.

*First*, there is a two-level increase "[i]f the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance." U.S. Sentencing Guidelines Manual §2D1.1(b)(12) (Nov. 1, 2016). According to the commentary, it "applies to a defendant who knowingly maintains a premises (*i.e.*, a building, room, or enclosure) for the purpose of manufacturing or distributing a controlled substance, including storage of a controlled substance for the purpose of distribution." U.S.S.G. §2D1.1(b)(12) comment. (n.17). "Among the factors the court should consider in determining whether the defendant 'maintained' the premises are (A) whether the defendant held a possessory interest in (*e.g.*, owned or rented) the premises and (B) the extent to which the defendant controlled access to, or activities at, the premises." *Id.* The commentary further provides that "[m]anufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises." *Id.* When a district court makes that determination, it "should consider

how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes." *Id.* This enhancement is based on a statutory directive, and is interpreted to mean "(1) knowingly exercising some degree of control over the premises; (2) knowingly making the place available for the use alleged in the indictment; and (3) continuity in pursuing the manufacture, distribution, or use of controlled substances." See *United States v. Elmore*, 586 F. App'x 559, 561 (11th Cir. 2014) (quoting *United States v. Clavis*, 956 F.2d 1079, 1090 (11th Cir. 1992). Thus, " '[a]cts evidencing such matters as control, duration, acquisition of the site, renting or furnishing the site, repairing the site, supervising, protecting, supplying food to those at the site, and continuity' constitute[] evidence of 'maintaining.' " See *id.* (quoting *Clavis*, 956 F.2d at 1091).

As defense counsel advised, the facts Defendant admitted to when pleading guilty clearly established the validity of this increase. Defendant admitted that he maintained a residence on Golf Terrace Drive. ECF 51 at 2. On July 8, 2014, a co-defendant came from the Golf Terrace Drive residence to sell powder cocaine to a Reliable Confidential Informant (RCI). ECF 51 at 2. On December 5, 2014, a confidential source (CS) observed cocaine and cannabis at the Golf Terrace Drive residence and Defendant instructed a co-defendant to "clean the house" because he believed law enforcement was in the area. ECF 51 at 4. On January 23, 2015, the RCI

purchased cocaine at that residence and observed about a kilogram of cocaine, a pound of marijuana, and a large amount of currency. ECF 51 at 5. On July 29, 2015, another CS purchased a gram of cocaine at that residence while Defendant was inside "cooking." ECF 51 at 6. On August 4, 2015, a CS purchased cocaine from Defendant at that residence. ECF 51 at 6. On August 13, 2015, a Cooperating Defendant (CD) purchased cocaine from Defendant and discussed future purchases. ECF 51 at 6. On August 25, 2015, the CD observed a bag of cocaine at residence and purchased 25 grams of cocaine from Defendant for $1,300. ECF 51 at 7. On September 11, 2015, the CD observed Defendant directing a co-defendant to sell cocaine to additional customers approaching the residence and, after leaving to get more cocaine from elsewhere, Defendant sold the CD 56 grams of cocaine for $2,600. ECF 51 at 8. On April 26, 2016, a CS purchased powder cocaine from a co-defendant at the residence. ECF 51 at 11.

Apart from these specific transactions, Defendant kept his cocaine and cooking utensils at this Golf Terrace Drive "trap house." ECF 51 at 8. He kept the drug proceeds at his primary residence. ECF 51 at 8. He deposited drug proceeds into the business account for his lawn-mowing business, All in One Lawn Care. ECF 51 at 8. That business was a front to launder the money Defendant obtained from the sale of cocaine. ECF 51 at 8. Defendant owned that business but did not conduct much legitimate business.  ECF 51 at 10. Defendant used a "prolific crack cocaine user"

to provide daily assistance selling crack from the Golf Terrace Drive residence. ECF 51 at 9. Defendant forbid others from selling cocaine not provided by him in the "box" that was the front yard of the Golf Terrace Drive residence. ECF 51 at 10. When law enforcement searched the residence, they found a "trap" consisting of a hole cut in the floor and concealed by a piece of furniture. ECF 51 at 11. Inside was a large, metal cocaine press and 116.9 grams of cocaine hydrochloride. ECF 51 at 11. Testimony from law enforcement at sentencing was consistent with the facts admitted at the plea.

Defendant apparently had a possessory interest in the Golf Terrace Drive residence. He exercised control over the residence. He made the place available for drug distribution. There was continuity in the distribution of drugs from that residence. The lawn-care business was a front for the drug conspiracy. Thus, the primary purpose of maintaining the residence was for purposes of drug distribution. Defendant has put forward no evidence whatsoever to contest these admissions—certainly none he provided to defense counsel before sentencing—only the conclusory assertion that he lived in the residence and ran a lawn care business from there, which even if true does not rebut his maintenance of the property for the drug trafficking.

Defense counsel's decision not to object to a §2D1.1(b)(12) enhancement was objectively reasonable. And, as a result, Defendant was not prejudiced by any deficient performance, for there was none.

*Second*, under Sentencing Guideline §3B1.1(b) there is a 3-level increase if the defendant "was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants *or was otherwise extensive*." *Id.* (emphasis added). Defendant's motion does not meaningfully address the emphasized provision. See ECF 172 ¶17.

"In determining the defendant's role in the offense, the district court should consider the following factors:

> [T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

See, *e.g.*, *United States v. Zepeta*, 389 F. App'x 907, 909 (11th Cir. 2010) (quoting U.S.S.G. § 3B1.1, comment. (n.4)). "There is no requirement that all the considerations have to be present in any one case." See *United States v. Ramirez*, 426 F.3d 1344, 1356 (11th Cir. 2005). "The defendant need only manage or supervise one other participant for the enhancement to apply." *E.g.*, *Zepeta*, 389 F. App'x at 909.

The facts Defendant admitted establish the validity of this adjustment. For example, On December 5, 2014, a confidential source (CS) observed cocaine and cannabis at the Golf Terrace Drive residence and Defendant instructed a co-defendant to "clean the house" because he believed law enforcement was in the area. ECF 51 at 4. Defendant used a "prolific crack cocaine user" to provide daily assistance

selling crack from the Golf Terrace Drive residence. ECF 51 at 9. On September 11, 2015, the CD observed Defendant directing a co-defendant to sell cocaine to additional customers approaching the residence and, after leaving to get more cocaine from elsewhere, Defendant sold the CD 56 grams of cocaine for $2,600. ECF 51 at 8. Defendant forbid others from selling cocaine not provided by him in the "box" that was the front yard of the Golf Terrace Drive residence. ECF 51 at 10. Moreover, testimony from law enforcement at sentencing established that Defendant distributed drugs extensively for years, involving multiple other distributors and purchasers. See generally ECF 153-8 at 4-35.

Defense counsel's decision not to object to the §3B1.1(b) enhancement was objectively reasonable. And, again, Defendant was not prejudiced by any deficient performance in this regard because there was none.

## CONCLUSION

Defendant has not met his burden to show ineffective assistance of counsel. Accordingly, the Government respectfully requests that the Court deny Defendant's motion to vacate, ECF 172, without further proceedings.

Respectfully submitted on January 18, 2022,

JASON R. COODY
United States Attorney

*/s/ Andrew J. Grogan*
ANDREW J. GROGAN
Assistant United States Attorney
Northern District of Florida
Florida Bar No. 85932
111 N. Adams Street
Tallahassee, FL 32301
(850) 942-8430
andrew.grogan@usdoj.gov

## LOCAL RULE 7.1(F) CERTIFICATE

I certify that this paper contains 5800 words, per Microsoft Word's word count, which complies with the word limit requirements set forth in Local Rule 7.1(F).

*/s/ Andrew J. Grogan*
ANDREW J. GROGAN
Assistant United States Attorney